Let's start with Louis Vuitton Malletier v. My Other Bag. Good morning, Your Honors. May it please the Court, my name is Robert E. Shapiro and I represent the plaintiff appellant Louis Vuitton Malletier in this case. Your Honors, we presented overwhelming, indeed uncontested evidence in the Court below that the defendant appellee, My Other Bag, was using Louis Vuitton's distinctive trademarks and two copyrighted designs to sell bags to consumers and that the consumers understood very well exactly what was being done here, wanting the distinctiveness, the fashion element that was represented by the trademarks that Louis Vuitton itself owned. The consumers thought that these were Louis Vuitton bags? They, it's unclear at all. Is there any evidence at all that they thought that these came from Louis Vuitton? Your Honor, there is evidence. Yes, there is. There is evidence that they referred to them as the Louis Vuitton and the LV. Well, is that as distinct from the various other My Other Bag bags that inherited other trademarks? Yes, there were. We don't have evidence with respect to what they did with respect to the other bags. Because you didn't take any survey, did you? We did not. You often do, don't you? I do. You bring a lot of these litigations and typically they come with consumer surveys, which Louis Vuitton can easily afford to do. When we focus on trademark infringement, that is true, Your Honor. In this case, we were focusing on trademark dilution. And dilution does not require a showing of likelihood of confusion, nor is there an element of actual confusion in the statute. Let me just sort these things out. What you said at the beginning sounded as if you were focusing on copyright infringement. Let me finish. That is that these people were using something of yours to sell theirs. And that's a very interesting question. That's a little bit like the recent Houshan First case and things of that sort. The other question, both the dilution and the trademark infringement, I do think you need to show some particular harm of the sort that the trademark is made less good or people are confused. And my problem, let me be quite direct, I don't see these things. I don't see confusion and I don't see particularly that the trademark is made less. I think there may well be a riding on your name to sell theirs if it isn't really a parody. And that's what I'd like you to, others may be interested in other things, but that's what I'm kind of interested for both sides. Let me move to parody, but first address your question. There is no requirement of confusion in a case of dilution. No, but there is a requirement of dilution. There is a question of the likelihood of dilution. I want you to deal with dilution, but since Judge Calabresi and Judge Lynch started with this question of confusion and you keep moving then to dilution. I'm sorry, I apologize. When you've been asked questions about your case here by Judges Calabresi and Lynch about confusion, you've quickly moved to dilution. You've presented us though with appeals from all of the rulings. So are you acknowledging that you don't have sufficient evidence of confusion to maintain your infringement actions? No, Your Honor. You can talk about dilution, but then you're going to have to come back to how you proceed on those claims without more proof of confusion. Your Honor, let me just address it very quickly. Judge Friendly and his Polaroid factors laid out eight factors. We showed substantial evidence with respect to many of those factors that they were in LV's favor, Louis Vuitton's favor. And all we asked for was a trial on infringement. We did not ask for a finding in our favor on infringement. But let me turn to dilution and the question of parity that was raised. Now, remember, dilution does not require confusion. Congress set out the six factors at the beginning. We met all the six factors. In fact, it was uncontested that there was an intent to create an association and an association was created. You know, those six factors are meant to focus on two things. And the first is association. And I don't think there's any dispute that the six factors establish association for you. But what there's a question here in this case is what about your proof on the six factors show that the mark was then going to be diluted, that it was going to somehow be of less value because of the association? Your Honor, I believe the way the statute works is that if you show the association because of the concern that Congress had of dilution by a thousand cuts, that is to say every cut was a little cut, you couldn't demonstrate an actual diminution in sales. But what you could show was that an accumulation of these things would result in a dilution of the mark. And we have a great example of that in this case because my other bag has now come out with a compact. And of course, there's no suggestion that it's a bag. It's a compact with the same markings, but with the same Louis Vuitton markings. And what they're doing is consistently diluting our mark. That's not before us, right? It is before us. Compacted? Yes. It's mentioned in our reply brief. Oh, wait. It's mentioned in your reply brief. Where is it in the complaint that the district court did? Well, it hadn't happened yet, Your Honor. Well, then you can file a lawsuit about that. We're here about a lawsuit about bags. No, but the question is whether there is dilution through a thousand cuts. Well, let's talk about the first cut. Explain to me how your mark is diluted. Is the idea that people are not going to buy Louis Vuitton bags because they can get away with making people think they have a Louis Vuitton bag at home by carrying my other bag? No. They wanted exactly what was done in this case. That is to say that — They wanted to make fun of you. No, they didn't, Your Honor. And I'd be happy to address that. See, that comes back to my question. It may well be that they don't dilute your mark. Your mark is just as good as it was before. And that they don't confuse in any way the trademark. But it still may be that they are using your name to sell their product. That doesn't go to the first two but may go to the third. Let me give an example. Suppose somebody put on a tote bag a quotation — brilliant quotation — from Judge Lynch that is not in the public domain and people buy the bag to get that quotation. That would be a copyright infringement if that quotation were there. Now, I understand, you know, unless it's a parody of Judge Lynch, which might well be, in which case it's not. Just quoting me would be a parody in itself. Well, let me explain why it wasn't a parody in this case. The only basis upon which the district court argued that there was a parody, there were two. One was he did his own inspection of the bag. And, Judge Calabresi, you've been very vocal on this in other cases that you cannot rely — I haven't been wrong in the other cases. Pardon me, I'm sorry. Well, you've been very vocal. That's not the way to do it. What you do is you look at evidence in the marketplace. What happened in the market? In this instance, there was no intention of parody. What was done was an expression of love for Louis Vuitton, an ode to Louis Vuitton handbags, a homage to Louis Vuitton. Tara Martin, the president of My Other Bag, said on her website, made it very clear, I love Louis Vuitton and I want to put it on something that I sell. Parody doesn't have to ridicule. I mean, the point, as I understand it, even from the get-go was that here's a relatively inexpensive canvas bag that pays the homage to Louis Vuitton, Chanel, other famous bags, but is a cartoon. So, you know, no one thinks that it's actually coming from Louis Vuitton. I thought your dilution claim was, look, your mark is built around only extremely high quality, extremely expensive products. And so when people put it on a $30 bag and you can get an association that way, your mark is diluted. Isn't that the whole theory? Well, that's what happened, Your Honor. They took it and they put it on a bag that was, and they, pardon me, Your Honor. Parodied it with, not by insulting it or making it a subject of ridicule. They're saying they parodied it by showing that, look, this is a cheap bag and, you know, but we're paying homage. There can be affectionate parodies. There, no. In fact, in the Salinger case, we had exactly that issue. And in the Charbucks case, you had exactly that issue. When somebody is showing love for or a real interest in or whatever, that's not parody. Parody is the attempt to make fun, to ridicule. I don't think that the law can overturn common sense about what parodies are. Well, but this is a joke. I understand you don't get the joke, but it's a joke. It was never intended as a joke. If you look at the actual- That's an interesting question. The evidence showed this. No, wait. Does the fact that somebody doesn't intend something as a parody mean that it cannot be a parody? That's what I've been sort of struggling with because you do have some evidence of non-parodic intent. I don't know if that's enough evidence because it is evidence of love, but I'm struggling, frankly, with the question of whether even if I intend to love somebody, I then express it in a way that is a parody, whether that is a parody or not. This Court's already decided that issue. In the Wolf Brothers v. Starbucks case, there was- Starbucks- I'm sorry. Wolf Brothers' argument was Charbucks, although it showed love, was also a parody. And the Court said, no, no, no. That's not a parody. You can't come in after the fact and claim parody when what you were doing was showing your love for the distinctiveness, the quality, and whatever. Court's already decided that in the case. That case also went on the fact that that was not a parody. Well, this isn't a parody either. Nobody ever claimed it was a parody until the litigation began. Suppose someone put out a bag that had the same picture of a Louis Vuitton bag on it and said, what kind of idiot would pay $10,000 for a bag that looks like this? Trademark dilution? Well, it could be, depending on how this was all set up and how it was actually marketed. But that, I think, would be much closer to an actual parody or- It's not a parody. It's just an insult. Now, suppose- A parody is a lampoon. According to the Supreme Court in the Campbell case, a parody is there to ridicule. That's what the Court said. A parody is there to target a particular mark or set of products and to ridicule it. There was no ridicule in this case. Suppose somebody had said, and there's evidence, I love Louis Vuitton. I think it's amazing that they've done all the things that they've done. But I do think that people are idiots to spend zillions for that. And then, with that love, put something on a bag that expressed or that suggested that people were idiots. Would that be a parody? It might be, Your Honor, but that's exactly what didn't happen in this case. I understand you're saying- It's exactly the converse. They didn't say anything about thinking that this was the wrong thing for people to be doing. What they said is, buy this as a compliment to your Louis Vuitton bag or even a substitute for your Louis Vuitton bag. That's the way they marketed it. There was no suggestion- I don't understand who ever marketed it as a substitute. Oh, yes. As a substitute. Did I miss something? Where in the record do they suggest that it's a substitute? In the record, what they said was, and I can give you the actual quotation- Well, I understand that they're saying you don't want to put your groceries in your expensive bag, so here's my other bag as a tote. And they're arguing, my other bag, this is not a Louis Vuitton bag, my other bag is a Louis Vuitton bag, just so that you, the person seeing me with my canvas tote, know that in my closet at home, I have an expensive bag. That trope was never marketed. That was something that the district court came up with on the basis of something that was said after the fact. I thought it came up with on the basis of what the whole thing was like. No, no. My other bag, the way it was marketed was, this is my other bag that's a complement to my Louis Vuitton bag, or a substitute in two ways. Not just that you might not want to put your gym clothes in a Louis Vuitton bag, although many people do, right? But also, if you can't afford a Louis Vuitton bag, you can afford this and get the same distinctiveness as a Louis Vuitton bag. That was expressly said in the marketing materials. That it's as exclusive as a Louis Vuitton bag? I'm sorry, I missed that. No, that it could be used instead of a Louis Vuitton bag if you can't afford a Louis Vuitton bag. And you will get the same kind of love for and distinctiveness of the inspiration, as Tara Martin put it, that comes with Louis Vuitton. Why? Because of the Louis Vuitton marks. That's exactly what dilution is. That's why someone would buy this bag rather than an LL Bean bag. That's exactly right, Your Honor. They're going to buy this. Yeah, absolutely. And so it was the, my other bag, was never the trope about my other car is a Jaguar. That was never part of the marketing. Never. It was never said. Hasn't everybody in the world known? Wait a minute. You're saying that because they didn't say in an ad, by the way, this is just like putting a bumper sticker on your car that says my other car is a Jaguar. That there's no allusion to that? And that's not anything we can do? They just said my other bag. They didn't say, oh, it's like my other bag is a Jaguar. Which, by the way, isn't parody anyway. But I can go into that. But they never made that part of their marketing. It just said my other bag. And what they did say is that this is the other bag that you can have with your Louis Vuitton bag as a sign of your distinctiveness, either with the Louis Vuitton bag, which is the way it was displayed, or separately without the Louis Vuitton bag. You could use it and still have the same distinctiveness. That's dilution. And it's not parody. Parody is an attempt to ridicule. There was no ridicule here. And that's what the Salinger case says. That's what the Harley Dickinson case, Davidson case, sorry. I'm not a motorcyclist. I know. You're more into bags than that. That's right. Motorcycles are not your bag. But that's what the Wolf Brothers, the Charbucks case says. It says that's not parody. And what the district court did is it looked at it itself based on everything it knew in the case, including everything that came after the fact. You'll notice in his decision, Judge Furman makes no mention of the record evidence of what actually happened in the marketplace. He ignores it completely. He uses his own subjective determination. And on that basis, says, well, it's a parody. And then the rest of the decision flows. Why, now you're confusing me. Sorry, Your Honor. Why isn't it perfectly proper for a judge, when deciding whether something is parodic, not to look at the marketplace? Oh, he. I mean, if. No, he has to look at the marketplace. No, but if I read something that I think makes fun on its face, makes fun of something, or says, aren't people stupid to be doing this, why does one care about the marketplace? That's a question of whether this is in itself parody, and therefore a First Amendment-y type of thing. That's separate from the question of whether people are riding on something, or selling something, or confusing something, or diluting something. The question of parody, I think, is exactly one that the court decides for itself, or may decide as a jury question. But the marketplace doesn't have much to do with what is a parody. Oh, I beg to differ, Your Honor, respectfully. The — it's, in fact, exactly what the case law says. It's the one thing that's bedeviled trademark decisions all along, is that judges make subjective decisions, as it's been said, in their own private chambers, rather than what's really happening in the marketplace. That goes to infringement. Well — That goes to dilution. But I'm not sure it goes to the question of what is a parody. Well — What does the market matter on whether something is parodic or not? What case can you cite me that says, when the issue is parody, you have to look to what the market says? I think every case this Court has ever decided says it's not up to the district court. It's up to what the market shows. Wait, so if the New Yorker runs an article that is transparently a parody of the work of Woody Allen, say it's not really a parody unless they label it parody or advertise, please read our magazine because we have a good parody of Woody Allen in it?  What you have to do is, of course, look at the mark, but then see what the record evidence shows as to how it's used in the marketplace. What was intended — I don't think there's such a thing as an unintentional  I think that's a contradiction in terms, because it's supposed to target something, and it's supposed to be speech about something. But first you have to look at how it was intended to be used, how it was used, and what consumers understood. Complimentary speech — And all of those go into the question of parody. Complimentary speech is not protected by the First Amendment. Only insulting speech is protected by the First Amendment. No. There are other elements of the statute that talk about commentary and criticism and parody. All those are provided for in the statute, and Congress was very careful when it which kinds of speech would be fair use and which would not. It actually had — I have trouble with what you just said, that there can be no such thing as an unintended parody. I've had people say to me, after I taught a class, that in that class I was a parody of myself because I was so much doing some things which I do, and I certainly didn't intend it, but I think they were right. Well, I don't think they were right, Your Honor, but I don't think that's a parody. I think under the Campbell decision that the Supreme Court had issued in the copyright context, they say clearly that what parody is is targeting another person's mark for ridicule. But that was because it was ridicule in that case. I mean, the whole — No, it specifically — — has a grounding in the First Amendment. What we're concerned about is whether or not it's — the product is commenting on the other product. I mean, I think it's really debatable whether Chewy Vuitton were meant to ridicule the product or just — Your Honor, it was a dog toy. It was a dog toy. It was a chew toy. Let me say this. I think that many of your customers who buy Louis Vuitton bags, if you market it, Louis Vuitton leather goods for dogs might very well spend the money for their — you know, the love of their lives. So — You can pass that to me. I don't take — I don't assume that just because it's a product for dogs that it was — Well, it was Chewy Vuitton misspelled as a dog chew toy that was a — I'm aware, Your Honor, the point I'm trying to make to you is it doesn't necessarily ridicule. It's coming up with a clever name so as to be clear that it's — you're not the origin. Well, then what would be dilution under these circumstances? Under that circumstance, nobody could — we couldn't protect people from — Let me carry on. This is that dilution should be read very narrowly. And my concern with you is that you seem to think that association is all you need. And I think there's a second step, which is blurring of the mark. And I don't understand where you think you've got blurring of the mark. If I may address that, Your Honor, what the standard is, is likelihood of dilution. And in — I understand. And in the legislative history, the Congress made very clear that what it was concerned about was death by a thousand cuts. And it specifically emphasized that the trademark holder ought to be able to go into court with the first of those cuts. In other words, before any kind of, let's say, fatal incident occurred, the first of those cuts was sufficient. And Congress made it very clear that that was what was provided. How do we decide what's a cut? The question is how we decide what's a cut. Also, the point I was trying to make to you, just so that you are responsive to it, is that if it's a parity, commenting on the product but making clear that it comes from a different source, et cetera, here, I'm not sure how that undermines — how that cuts into the value of the mark. Well, Your Honor, our belief is that the evidence below is overwhelming that this was not a parity. And like the Salinger case and the Harley-Davidson case and the Charbucks case, it's insufficient after the fact to claim parity when what you're doing is something very different. I just want you to take a few minutes. We've kept you well past your time. Just a few minutes to tell us how you think you make out copyright and trademark infringement in the absence of confusion. Copyright infringement is very straightforward. There were two marks that were copyrighted. We don't believe that this was a transformative use that would allow for a fair use determination. They didn't use your mark exactly. They made significant changes. Actually, that's not quite correct, Your Honor. Do you have a toil pattern? I'm talking about all the various patterns. The original idea for these was a picture that was drawn for — I'm not concerned with the original idea. We've got the bag that was marketed. They substituted N.O.B. for — N.M.B., whatever it is, for L.V., and the bag is a cartoon. So how is it a copyright? The bag is not a cartoon, Your Honor, respectfully. The bag is an attempt to duplicate pictures that appeared in a newspaper to show the bags. It was not a cartoon. In addition, I actually asked the expert that they proffered whether he could tell the difference between the marks, and he could not. He couldn't tell the difference between L.V. and L.V.? He could not tell the difference. I'm not an expert on ladies' bags. Well, Your Honor, the fact of the matter is they're not cartoonish, and we also do a similar thing as Louis Vuitton, where we put a picture of our bags on the side of our bags. We've done that, and we make mention of that in our brief. We do that, too. But was the use of that identical, or were there changes in it? Because in the cases in which we have tended to say that this has been a violation of copyright, and therefore selling products by using somebody else's, one of the things we have looked at, it's not the only thing, is whether the thing was used exactly in the same way. That was important in Who's On First. That's important in, again, my parody before of Judge Lynch. If instead of being his quotation, it would be something that's quite, you know, somewhat different, that would make a difference. So was this the same, or were there differences? Well, there were slight differences, Your Honor, but slight differences aren't sufficient. There has to be some transformative use. And there was nothing transformative. There is a transformative use. Am I right that it all comes down to the same parody question, that really the only thing that's at issue here is whether this is a parody? I think that it's probably the most important question, Your Honor. I agree with you. And I believe that there is— Because if it is a parody, then it is a transformative use. Well, parody under the trademark dilution and parody and copyright are not exactly the same, but I will grant you— As far as copyright, if it is a parody, then it almost always is a transformative use and is fair use. So even if it is the same, that— The Supreme Court actually has not gone that far. It says that it's not sufficient to say it's a parody or for it even to be a parody to make it absolutely— Yeah, but you— Absolutely, well, for it to be not a copyright violation. I'm asking you this because the district court suggested that you had trademark and dilution claims and then you threw in a copyright claim. I understand the point, your response to me just a moment ago with respect to trademark, that the changes are insignificant to that extent. I'm not sure I understand it with respect to copyright. Once the changes are made, you have a harder case on copyright. I agree we have a harder case, but remember there's also a requirement of substantial similarity, not total similarity. The courts have been very clear about that. What they're using is something that even their expert can't distinguish on the side of the bag. I think you're going to find you have substantial similarity. But we didn't just throw in the copyright claim. We have copyrights and we're entitled to enforce our copyrights and there are different rights that come from copyrights. In addition, if there was ever any concern about whether the evidence was sufficient with respect to substantial similarity, that would be a question for a jury. All right. Why don't we hear from your adversary? Thank you very much for taking all our questions. Thank you, Your Honor. Good morning, Your Honors. David Korzenich, Miller, Korzenich, Summers, and Raymond, on behalf of the defendant, my other bag. What's a parity? Well, a parity— What is the parity? Oh, in this case. I'm going to define it generally and I'm going to apply that definition. Parity, as it's defined and referenced in Campbell, speaks— No, what is the parity in this case? Okay. The parity here is just as the parity in Cliftnotes. There are two things side by side. On one hand, it is something, it pretends to be the original and yet at the same time, it puts out a competing message that it is not the original. And it is in the tension between those two messages that the joke— You mean any time you have something next to something which is different, it says, this looks like the original but is not an original, that is enough to be a parity? That is enough to be transformative? That is enough to get the First Amendment-y type of protection? Or is it because by putting something next to something, we are saying something that is of transformative value and that needs to be protected? That's correct, Your Honor. So in this case, what is it that you are doing that transforms, that does something? What is it you're saying that is parodic? Yes, the statement is this. I'm just going by the definition of parity both in Campbell and in Cliftnotes. What is the comment? So there is a juxtaposition of two different messages and the tension is what I was talking about. Here's the tension that creates that message. What is the message? That's what I'm about to identify. The message is that Louis Vuitton projects an image of exclusivity and pretentious and conspicuous consumption. That is the message that Louis Vuitton projects to the world. Your message. Your message is that that's silly, right? That's silly, exactly. That in fact, we're somewhat uncomfortable with ourselves to the extent that we want such things, but we also understand that, but we also look, but we're also... My question... I started this line of questioning. Let me just finish. Why doesn't every Chinatown knockoff send that message? Because a knockoff is not clearly different. In other words, the knockoff is attempting to be the same and to substitute itself for the original. This is not trying to substitute for the original. It's saying it is not the bag. It is not the Louis Vuitton bag. It is another bag. It only says that the viewer sees both sides of the bag, right? I mean, you didn't put my other bag on the side of the bag with the Louis Vuitton depiction. But there are many other things that signal the fact that this is not a Louis Vuitton bag. Let me say this to you. If a woman is walking down the street with this canvas bag on her arm, people who see it are not necessarily going to get up close enough to see that it says NMB rather than LV in the logo part of it. So why wouldn't they think, oh, Louis Vuitton is now making canvas bags? I think that if you look at those objects and you see... Canvas tote bag. Well, number one, they are putting the... First of all, it is a cartoon image. It is not even substantially similar. It's a Louis Vuitton image. It is not. So why wouldn't that be... You know, Louis Vuitton makes a canvas, what I call them, a tote bag. They put their address on it as opposed to their toil pattern. You've put their toil pattern on it. We have... What's the parody in that? Well, the parody is the fact that the viewer understands that, in fact, it is not a Louis Vuitton bag. Now... But let me ask you, let me go back to that question. Let's suppose that there is enough evidence that the original intent was to show affection for rather than to say, isn't it silly that people are spending so much money for something of this sort? And let's suppose that you have shown enough to show that people, or at least some people, will look at this and say, boy, isn't it silly that people are spending that much money? Does that make it a parody for our purposes and under our cases if the origin of it was not parodic, but the way it can be viewed is? I think there are two questions. For the purpose of copyright, the measure of whether something is parodic is on the face of the work themselves. And I'll tell you why. Because when Justice Souter speaks of parody and speaks of the transformative purpose, he says that comes from the perceived, that's the word he uses, meaning of the works that appear before them. When it comes to dilution, so that is something that's manifest in the works themselves, whatever the artist may have thought. I mean, it's interesting when you speak of musicians tend not to be particularly articulate about what they're doing. And yet their own uses of things may be quite transformative. So the person's purposes, or their poorly expressed purposes, will not necessarily, will not determine, as I think Your Honor's determined in Prince, what they say about what they do does not determine whether it's expressive or transformative or not. Is that so? Do we get that perception just from our own look? Or does there need to be some evidence of the way in which ordinary people seeing this product on the street, in a market, in a magazine ad, perceive it? I think Justice Souter uses the word reasonably perceived, so that the standard is what a reasonable person would perceive. And also, because First Amendment— What a reasonable person would do, think, perceive, understand is usually a jury question. But it is an assessment on its face that a court can determine, not from a survey. And with respect to dilution, let me ask you, is the reasonable person only the purchaser of the bag, or is it also someone who sees the bag being carried? I think that it is— Where the concern is dilution. All right, now, on dilution, I want to change what I'm saying about this. In other words, when it comes to whether something is expressive or not, such as to trigger, First Amendment concerns, then a court may determine that and should be determining that in order to make sure that the First Amendment values are duly protected. Okay, now— If— Now let's shift to dilution. To the extent that we are now looking at whether there is dilution harm or not, and that's what those factors are looking at, we do then need to look at the market impact. And here's what the plaintiff has given us on that. Nothing. They have been before this Court many, many times. They know what the law requires of them with respect to dilution. You are saying that with respect to copyright, the question is how it is perceived as to being parodic or not, not original intent. And with respect to dilution, it's a question of whether people walking down the street will think less of this mark or will dilute it in some way because of what it is, and that that is their burden which they have not met? I'm saying that, but there's slight difference in what I'm saying. The whether there is dilution harm is a market harm issue that they've not shown. But, important thing here, whether there is parity or not, whether there's expression or not that would trigger First Amendment intervention against trademark or dilution, that, too, is a judicial assessment that can be made on the surface on an inspection, examination of the words. Is that the same as the copyright one or is that different? Well, whether something has a parodic purpose or whether something is a parodic expression or not is something that a court can and must assess on the face of things. Yeah, but what I'm asking is, you told us that with respect to copyright, it is not intent, but it is how it is perceived. Perceived. We'll have to decide if we're right or not. Correct. Are you now telling us that with respect to trademark and infringement and dilution, it is the same thing? It is how it is perceived or there does the original intent matter more? I'm just curious in your argument. Yes. Two separate things that I'm saying. I'm not blending them. One of them is that if, now looking purely from the dilution and trademark issue, there are two questions. Is there a parodic or an expressive dimension to the defendant's work? That is an assessment that, again, is made on the surface of the work. Yes, it is made on the surface of the work only, or does the intent matter there? Intent does not matter there. So that is the same as on the copyright. As to whether it has an expressive dimension. Yes, yes. That's correct. But as to whether there is dilution impact, that would be more of a market issue. You cite us, Justice Souter, as perceived in a copyright. As reasonably perceived is what he says. What do you cite us for the same notion that intent is irrelevant and it is how it is perceived when you're talking trademark or dilution? What case do you have of somebody saying the same thing about, I don't care about intent, it's whether it is parodic in effect when you're talking about these? Yes. I would refer, Your Honors, to Judge LaValle's decision in Yankee Publishing in which he goes through the factors and looks at the issue about intent. And he recognizes that when people are making a, conveying an expressive, making an expressive work in the context of a dilution claim, in the face of a dilution claim, in the face of a trademark infringement claim, the intent to associate themselves with the plaintiff's mark is not itself, it does not operate against them, it operates in their favor because all parodies intend to associate themselves with the plaintiff. Judge LaValle there was talking about intent to associate. He wasn't talking about intent not to parody. See, the thing about this is that the opposing counsel makes an argument, not that there was about intent to associate. There's no question there was an intent to associate. Nobody can doubt that. Opposing counsel says that the intent in the association was an intent to love. You're telling us that for copyright that doesn't matter because you have Justice Souter telling us its perception. I don't believe that Judge LaValle in that case said anything about intent to love not being a matter. Now, that may not matter because when you're talking about dilution and trademark, you also have to have market effect, as you've said, the second thing. It maybe comes to that, but I don't quite know the basis for your saying that intent not to parody is irrelevant when you're talking trademark and dilution. I, again, stand by the point that when you're dealing with whether something is expressive or not, that must be a judicial determination that is based on the objects themselves. And that is because in Mattel in the Ninth Circuit or in Cliff Notes in the Second Circuit, at all turns when the court discerns an expressive aspect to the defendant's work, then the First Amendment rights are triggered even when that is a hybrid commercial speech. But in looking to how parodic the effect is, should we also look to the original intent? That is, there are things which are manifestly parodies. There are things we're finding the parody is a little bit more difficult. Here, you are arguing that what this says is how silly people are. That's not quite the same as many parodies. In doing that, are we allowed also to ask what the person intended or not? I don't think that it makes that much of a difference, and I think your honors were actually quite correct. In the Prince case, to the extent that you were pointing to the fact that often artists are not articulate about what their purposes are. Judge McCasey, for example. I have trouble understanding why you are implicitly conceding that the owner of my bag's comments about admiring Louis Vuitton can make it not a parody. When Woody Allen makes fun of Madame Bovary, it doesn't mean that he thinks Flaubert is crap. You're right. It means that he's poking gentle fun at something. It's not inconsistent to say, I have no intention to degrade this product, than to say, but there's something silly about it after all. Why is that? I just don't get it. I don't mean to be conceding that at all. I just was trying to address Judge Calabresi's point about where one looks to discern a parodic purpose. Absolutely, the Second Circuit has been very clear that you don't have to just be out to get someone. Just be out to belittle them in order to make an expressive or transformative comment. In fact, the point being made here is one that shows a kind of ambivalence about the way in which we feel about these kinds of values. The problem that you've got in a way standing here is that it's as if Mr. Seinfeld or Mr. Chappelle was up here and we were saying, explain that joke. Tell me why that's funny. Tell me why this makes fun of something. Explain the exact message of the humor when the audience just laughs. I think that's right. I think that if Your Honors would examine one of the things that's kind of interesting about the plaintiff's argument here is they'd like you to just look at, ignore the my other bag side of the bag. Ignore the fact that it's a cartoon. Ignore the fact that no expressive, creative expression is used from their original bags. Ignore the fact that these things are canvas and washable, that they have their own names, that they keep changing. And that's what they're really asking you to do is to somehow isolate this in some way that still preserves it as something that is theirs. The joke is manifest in the thing that they've been doing since the outset. It's always been my other bag is. It's not my other bag is, it's my other bag. Right. My other bag. Right. My other bag dot, dot, dot. That gives them their argument that this is the other bag, not there's another bag in the closet. But you've made a number of points that raise concerns in my mind. I want to tell you what they are and hear what your response is. You're taking the view that it's for the judiciary to decide if something is expression. And I'm not clear on that. I would see where on summary judgment, we could certainly say that as a matter of law, no reasonable fact finder could conclude otherwise. But I'm not sure that we make a factual determination. So I want you to, um, clear that up. And then second, um, I want you to address the fact that, um, you, you've tried to suggest that, um, intent is not, not a factor here. It's only what a reasonable person would, would, um, understand it to mean. I'd like to suggest to you that both can be relevant to deciding if something is parodic. First of all, does the, um, speaker intend to communicate something and then would a reasonable observer understand what he now says it was his intent to communicate. But, you know, you've thrown around words like the purpose, the parodic purpose that suggests an intent. I'm not, not, uh, sure why you think that intent is irrelevant here. It may, I think that it is the less significant factor here. In other words, we're, I'm, what I'm really pointing to is where do you look to determine whether something is parodic or not? In the first instance, the most instructive. If there was conclusive evidence, like a letter or a document that says, let's put this out there and perhaps there will be foolish people who will think it's a Louis Vuitton bag. So no parodic intent, marketing it in the hopes that people will be confused. Or even without marking it in order that people would be confused, uh, but just saying a letter that said, if we put this on, people will buy it because they'll notice this. You know, I'm trying to sell it. I put this quotation or I put this on because I want to sell. It's very relevant to whether then the thing can be viewed by some people as being parodic. Or is that part of my question was that assume that the, the, um, copying intent is clear, but the copy is so poor that everyone laughs at it and thinks it's a joke. I mean, I'm not sure you get parodic protection for such conduct. Do you think you do? What we're talking about is where does one look to determine whether something is parodic? And the most important, yeah. You seem to think it's a question for the court and I'm suggesting to you only if it's clear as a matter of law. And second, that intent can be a factor and, and may in fact be an important factor. I think that it can be a factor as to dilution itself, but it is less compelling a factor if it has any impact at all, uh, on the question of whether it is expressive or parodic. In other words, I think that when we're trying to determine if something is a parody or not, we first examine the works themselves to see whether they in fact do convey that message. That's to suggest that no matter what you intended, if the reasonable person wouldn't think it is a parody, you can't get the protection. I think that that could be a problem. That could be a problem if there was a failed parody, uh, that a, a defendant attempted. And, and here's the thing that's very interesting is that Judge LaValle in a line that is that, uh, no, I could finish the question. Okay. Yes. You're trying to argue to us as I understand it, that even if you didn't intend it as a parody, a court should see it as a parody. Is that your argument to us? I think that the, what appears on the surface is probably the most compelling factor. There are many people whose parodies. To answer the question I asked you, is it your position that even if there's a question in the record here as to whether you intended it to be a parody? If you... That you, that you're entitled to the protection of parody. I do think that if you intend something as a parody and it fails, then you should still be entitled to some level of, some protection because of that. I, that is not something that's at play in this case, but it's an interesting point about whether a failed parody that was intended as a parody, if that's what your Honor... No, that's not my question. The drag is the flip side of that. Which would be? He was asking you whether if there was clear evidence that it was not intended as a parody, is it still, is that irrelevant, that evidence? It's not irrelevant, but it's not powerful evidence. To the contrary, if something turns out to be... This can be at various things. It can be with respect to delusion and confusion, and it can be at the copyright. So that somebody, we have unmistakable evidence that the reason they are doing this, that they are using somebody else's trademark is to sell. But the way they happen to do it then causes people or even a court to say, ha, that's funny, that's a parody. Does that make it a parody in the face of unmistakable evidence that the intent was not to parody, but to sell? There's no evidence here in this case that anyone has ever had anything other than an attempt, than a purpose to make a joke. The word, my other bag, has been on this work since the very outset. We have never done anything otherwise. Now, I do want to make one point before I depart that relates to... Do you have evidence that the fellow who came up with the idea specifically alluded to the bumper stickers? Yes. In fact, Dan Venske, who was the designer of this, in fact wrote specifically to Tara Morton that that is exactly what they were intending to play off of. And that when they came to a consensus about what he was going to be commissioned to do, I have his line here, but it's... All right. The answer is yes. The answer is yes. Yes. Our time is now running. In an email, he said the idea is like those bumper stickers, the same my other car. My next point is... The problem, frankly, with this case for me is that on the one hand, the motive evidence isn't so strong. And as you said to Judge Lynch, you're not conceding that there was any motive of that sort. On the other hand, the degree to which this was parodic by looking at it also isn't as strong as in many other cases. So that, yes, when you answered that is not this case, I think that's so on both sides of the fence. I'll just close with this. The Louis Vuitton is a highly experienced litigant before this court. And they've had an extensive education from this circuit and others on what the law requires of them. They have brought many, many cases against people that have failed and that were objectively unreasonable. The hangover case recently where Louis Vuitton bags were used in a movie was permitted by the Southern District. In the Netherlands, they sued a young woman artist who used a Louis Vuitton image on a cartoon of a Biafran girl. An excellent First Amendment or Article 10 lawyer, Jens Vandebrink, defended her and they prevailed. And in the University of Pennsylvania, received a threat letter from these people when they used a Louis Vuitton, I think it was their toile image on a poster for a trademark. How does that inform our decision? Just what's your point? The point that I'm making is that the, is that Louis Vuitton understands what has to be done to prove a dilution case. They have to come forward with some evidence of likelihood of harm. That's what they learned in Dooney and Burke. They did nothing of the kind here. They did, they did not provide a survey. They did not put forth an expert to talk about market impact. They had no evidence of either confusion or dilution. They have a handful of twisted anecdotal things that have been mischaracterized and the court caught them on it. And, and this is important, their head of IP enforcement in his deposition was asked whether there was any kind of impact of this on their, of this, my other bag on their sales or on the force or power of their mark. And the answer was consistently no, no, no. Now the other thing that is significant here, not only did they admit that there was no economic impact, there was no diluted, no evidence of any kind of dilution. We've now passed three years since this lawsuit began. And as this court and others have found, when you walk in the first time before anything has happened, you can try to suggest that maybe there's some death by a thousand cuts and you get all hysterical about it. But they have not shown one cut. But what I, I just want to conclude. Thank you, Your Honor. With respect to the last point, of course, this is exactly why the TIDRA was passed, the Trademark Dilution Reform Act, so that you don't have to show an actual dilution. It's likelihood of dilution. And that's why Congress changed the law after the Mosley case. With respect to the issue that was raised about... But shouldn't you show from some market survey a likelihood of dilution? Well, it's interesting, Your Honor. I just asked my... Wouldn't it be helpful? I just asked my colleague. I'm not sure exactly what that, what that survey would look like. I'm not aware of any case in which anybody has put forth a survey on likelihood of dilution as opposed to likely... The evidence that you want us to look to is showing likely dilution. Right. The likely dilution factors are set out in the statute. There are six of them. We demonstrated not substantial evidence with respect to all, but undisputed evidence with respect to all. The commentary suggests that the factors really are more helpful in pointing to association than likely harm. Tell us how the factors in this case show that there's going to be the likely dilution. Sure. The whole point of dilution is free riding. Somebody is using your marks to sell their products. And what happens... That's not necessarily so because dilution is two marks for two products. One mark, two products. One mark, two products. But there being a blurring with it. One mark with two products is infringement. It's that there's a different mark, but it's being associated with yours so that yours becomes blurred as identifying your product. No, dilution is one mark, two products. They're using our mark to sell their products. That's exactly what dilution is. Could you just explain what it is that people are going to think that constitutes the dilution? What people are going to think is that this bag gives them the same distinctiveness and exclusivity, the same kind of fashion statement that they would get from carrying a Louis Vuitton bag. And how do we know whether people think that? What is the evidence? Do you just look at it and... No, we had substantial evidence of exactly how the consumers received this. They referred to the bags as the Louis Vuitton and the LV. They're not confused, Your Honor. Where did they say anything like... Where is there any evidence that anybody in the world ever thought that they were getting the same cachet, et cetera, from this bag? That's confusion, Your Honor. We're talking... Well, I thought that's what you... Excuse me. I thought I asked you to tell me what is it that people will think that will constitute dilution or blurring of the brand. And you told me that what they are going to think is that they are getting the same cachet, et cetera, as from a Louis Vuitton bag. So I'm asking you now, what is the evidence that anyone ever thought that? Or is that something that, like your adversary says, we just look at it and say, oh, I guess that's what they... Because this is what they were invited to do. They were invited to carry it as a compliment, not my word, Tara Martin's word, a compliment or a substitute for. This is the way in which it was marketed. It was marketed with a Louis Vuitton mark and with their bag right next to it, with my other bag. When you get to your jury, you're going to argue to the jury that a reasonable eight people in the Southern District of New York would accept the idea that they would think or that a reasonable other person would think that they're getting the same cachet from carrying this bag as they would... And I would suggest that the question that was asked... I'd suggest before you go to that trial... Of course, you just want to bully them into having to spend the money on a trial. No, Your Honor. I suggested if this were a real trial and you tried that out on a mock jury and you tried that out with some jury consultants, you would be laughed out of the room if you thought that people are going to think that they got a cachet out of carrying their canvas bag for 30 minutes. Our bags are canvas bags. We do what they did on the side of their bags. They have our marks on their bags. All of those things, I think, lead to just the circumstance that we were talking about, which is that when somebody walks down the street and they see that, they say, Aha, look at that. A high class bag. Why? Because it has Louis Vuitton's marks on it. And it's a tote bag of the sort that the Louis Vuitton bag is. And it might even be next to the Louis Vuitton. I thought your argument on dilution was that people would think that bag relative to yours was junk and that you didn't want your trademark on a product that was junk because that blurs the ability of the mark to designate the high end bags. And that's why you don't want it on any of a number of other pedestrian products. I think you're putting together infringement and dilution. Good. Now I understand your dilution claim. And it's more problematic for you than I thought originally. No, the dilution claim is a claim that they're using our marks to sell their bags. And I do understand it's one mark, two products, but I thought it was, you don't want your mark on a product that's not of the quality that you emphasize. Certainly, that can be part of the statute under the tarnishment version, the tarnishment part of the statute. We focused on blurring. Blurring blurs distinctiveness. The fact of the matter is what is to prevent all kinds of people for now putting their R marks on their bags to sell them and then saying, oh, it's funny. The question of whether it's a junk bag, that goes into infringement. That's one of the Polaroid factors. And that's one of the things that we demonstrated that was in our favor, which is why I think we're entitled to a trial there. So I think the real, we have to keep distinct dilution and infringement. And I think that what we showed clearly was that there was an association. There's really no dispute about it. And they then have to come in and prove it was parody because that's what the statute says. It says there must be an affirmative showing by them that it's a parody, but they can't show that they intended to be a parody. They can't show that people understood it as a parody. They can't do either of those things. That's why we thought we were entitled to judgment below, but we're at least entitled to a trial. And respectfully, Your Honor, I relish that trial. I think people will understand very clearly what they're doing and will understand that they're trying to use our marks to sell their bags. And I don't think we'll have any problem with that. And we don't bully people. We raise cases. How well you would do it at a trial. Thank you both very much. Thank you, Your Honor. We've kept you well past your time. Thank you for answering our questions. Very interesting argument. Thank you both. United States v. Yalenkak. I just wanted to have the bags. No, thank you.